Docket No. 15-15789

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

IVAN PENTCHEV IONTCHEV, *et al*.,

*Plaintiffs-Appellants*

vs.

AAA CAB SERVICE, INC., an Arizona corporation, dba AAA Sedan, dba AAA Yellow Cab Company, dba Aguila's, dba Checker, dba Courier, dba Fiesta, dba Neal's, dba TLC, dba Yellow; *et al*.,

*Defendants-Appellees*

---

On Appeal from the United States District Court
for the District of Arizona
(Honorable Roslyn O. Silver presiding)
Nos. 2:12-cv-00256-ROS, 2:13-cv-02152-ROS, 2:14-cv-00038-ROS

---

# APPELLEES' ANSWERING BRIEF

---

Laurent R.G. Badoux (020753)
badouxl@gtlaw.com
Dana L. Hooper (023801)
hooperd@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback, Suite 700
Phoenix, Arizona 85016
(602) 445-8000
*Attorneys for Defendants/Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record for Defendants-Appellees AAA Cab Service, Inc., Yellow Cab Co., and H&M Enterprises, Inc., hereby state as follows:

There is no parent corporation nor any publicly-held corporation that owns 10% or more of AAA Cab Service, Inc.

There is no parent corporation nor any publicly-held corporation that owns 10% or more of Yellow Cab Co.

There is no parent corporation nor any publicly-held corporation that owns 10% or more of H&M Enterprises, Inc.

DATED this 28th day of October, 2015.

/s/ Laurent R.G. Badoux
Laurent R.G. Badoux
Dana L. Hooper
GREENBERG TRAURIG, LLP

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS...................................................................... i

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION...................................................2

ISSUES PRESENTED......................................................................3

STATEMENT OF THE CASE..........................................................3

STATEMENT OF FACTS ................................................................4

    I.     THE PARTIES' CONNECTION BY THEIR COMMON
           DESIRE TO OPERATE AT THE AIRPORT. ....................................4

    II.    THE TAXICAB INDUSTRY IS SUBJECT TO EXTENSIVE
           GOVERNMENT REGULATIONS THAT BIND AIRPORT
           DRIVERS AND DEFINE THE ENVIRONMENT IN WHICH
           THEY APPLY THEIR TRADE BUT THESE
           REGULATIONS ARE NOT PROMULGATED BY
           DEFENDANTS....................................................................................5

    III.   AIRPORT DRIVERS (PLAINTIFFS) OPERATE WITH
           COMPLETE INDEPENDENCE WITHOUT ANY AAA CAB
           OVERSIGHT. ......................................................................................8

SUMMARY OF THE ARGUMENT ....................................................10

ARGUMENT ......................................................................................12

    I.     STANDARD OF REVIEW ................................................................12

    II.    THE DISTRICT COURT CORRECTLY UTILIZED THE
           WELL-ESTABLISHED ECONOMIC REALITIES TEST IN

RULING THAT PLAINTIFFS ARE INDEPENDENT
CONTRACTORS...................................................................14

A.    The Economic Realities Test is the Seminal Standard For
Determining a Worker's Independent Contractor Status
in Wage and Hour Matters.............................................15

B.    Plaintiffs Improperly Try To Modify the Economic
Realities Test in Reliance Upon a Non-Binding
Department of Labor Interpretation.............................16

III.    THE DISTRICT COURT PROPERLY GRANTED
SUMMARY JUDGMENT TO DEFENDANTS
DETERMINING THAT PLAINTIFFS ARE INDEPENDENT
CONTRACTORS UNDER THE FLSA. ..........................20

A.    Under the First and Most Significant Prong of the
Economic Realities Test, the District Court Accurately
Held That Defendants Do Not Exercise Control Over
Plaintiffs' Work..............................................................24

B.    The District Court's Finding That Airport Drivers Are
Free To Develop Business Was Correct.................................34

1.    The Evidence Clearly Shows that the Airport
Drivers Operate Their Own Business.............................35

2.    Airport Drivers Have Independent Business
Opportunities and Plaintiffs' Argument that They
Are Illusory is Wrong. ....................................39

C.    Airport Drivers Retain the Opportunity for Profit and
Loss in Their Operations of Their Taxicabs. ...........................41

D.    The District Court's View That Some Factors Favor an
Employment Relationship Was Inaccurate..............................45

1.    The District Court Erred in Deeming the Airport
Drivers' Investment Factor "Neutral." ..........................46

2.    The District Court Did Not Thoroughly Assess If
Driving a Taxi Requires the Type of Skill
Contemplated by the Economic Realities Test..............48

ii

　　　　3.　The Airport Drivers Do Not Have a Permanent
　　　　　　Relationship with Defendants..........................................50

　IV.　NO JOINT EMPLOYMENT ISSUE EXISTS HERE........................52

　V.　PLAINTIFFS' OUTRIGHT FAILURE TO PROVE THEIR
　　　MINIMUM WAGE CLAIMS FURTHER REVEALS THE
　　　FUTILITY OF THEIR CASE..............................................54

CONCLUSION ...................................................................57

STATEMENT OF RELATED CASES .................................................59

CERTIFICATE OF COMPLIANCE ...................................................60

CERTIFICATE OF SERVICE .......................................................61

PHX 331556042v15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transit, Inc. v. NLRB,*
679 F.2d 1095 (4th Cir. 1982) ....................................................................22, 27

*Anderson v. Mt. Clemens Pottery Co.,*
328 U.S. 680 (1946)........................................................................................13

*Arena v. Delux Transp. Servs., Inc.,*
3 F. Supp. 3d 1, 13 (E.D.N.Y. 2014) ............................ 22, 43, 44, 49, 52, 56, 57

*NLRB v. Associated Diamond Cabs,*
702 F.2d 912 (11th Cir. 1983) .....................................................................22, 27

*Boyd v. Nashville Limo Bus., LLC,*
No. 3:11-cv-0841, 2012 WL 4754659 (M.D. Tenn. Oct. 4, 2012) ...................49

*Castillo v. Givens,*
704 F.2d 181 (5th Cir. 1983) (overruled on other grounds)..............................42

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)........................................................................................13

*Checker Cab Co.,*
273 N.L.R.B. 1492 (1985) ..........................................................................23, 24

*Christopher v. SmithKline Beecham Corp.,*
132 S. Ct. 2156 (2012).............................................................................17, 19, 20

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979)........................................................................................18

*Elite Limousine Plus, Inc.,*
324 N.L.R.B. 992 (1997) ................................................................................23

*Equal Emp't Opportunity Comm'n v. N. Knox Sch. Corp.,*
154 F.3d 744 (7th Cir. 1998) ..........................................................................33

*NLRB v. Friendly Cab Co.,*
512 F.3d 1090 (9th Cir. 2008) ......................................................11, 22, 27, 34

iv

*Hammond v. Clayton*,
   83 F.3d 191 (7th Cir. 1996) ..............................................................54

*Imada v. City of Hercules*,
   138 F.3d 1294 (9th Cir. 1998) .....................................................13, 57

*Landers v. Quality Commc'ns, Inc.*,
   771 F.3d 638 (9th Cir. 2014), *as amended* (Jan. 26, 2015), *cert
   denied*, 135 S. Ct. 1845 (2015) ...................................................55, 57

*Leach v. Kaykov*,
   No. 07-CV-4060 (KAM)(VVP), 2011 WL 1240022 (E.D.N.Y.
   2011) ..............................................................................................49

*Local 777, Democratic Union Org. Comm.*,
    603 F.2d 862 (D.C. Cir. 1975) .......................................................21

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007)....................................................................17, 18

*Mathis v. Hous. Auth. of Umatilla Cty.*,
   242 F. Supp. 2d 777 (D. Or. 2002) .................................................52

*McLaughlin v. Seafood, Inc.*,
   867 F.2d 875 (5th Cir. 1989) ..........................................................48

*Musick v. Burke*,
   913 F.2d 1390 (9th Cir. 1990) ........................................................12

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015).............................................................17, 18, 19

*Rabanal v. Rideshare Port Mgmt., LLC*,
   B239708, 2013 WL 6020340 (Cal. App. Dep't Super. Ct. Nov. 13,
   2013) ..........................................................................................27, 32

*Real v. Driscoll Strawberry Assocs.*,
   603 F.2d 748 (9th Cir. 1979) .......................................................16, 34

*Saleem v. Corp. Transp. Grp., Ltd.*,
   No. 12-CV-8450 (JMF), 2014 WL 4626075 (S.D.N.Y. Sept. 16,
   2014) ........................................................................22, 42, 43, 44, 46

PHX 331556042v15

*Seymour v. Coughlin Co.*,
609 F.2d 346 (9th Cir. 1979) ........................................................53, 54

*SIDA of Hawaii, Inc. v. NLRB*,
512 F.2d 354 (9th Cir. 1975) ............................... 11, 21, 23, 27, 31, 33

*Skidmore v. Swift*,
323 U.S. 134 (1944)........................................................................18

*Usery v. Pilgrim Equip. Co.*,
527 F.2d 1308 (5th Cir. 1976) ........................................................48

*Wells v. FedEx Ground Package Sys., Inc.*,
979 F. Supp. 2d 1006 (E.D. Mo. 2013), *rev'd sub nom. Gray v.
Fedex Ground Package Sys., Inc.*, 799 F.3d 995 (9th Cir. 2015)...............40, 41

*Yellow Taxi Co. of Minneapolis v. NLRB*,
721 F.2d 366 (D.C. Cir. 1983)........................................................22, 27

**Statutes**

5 U.S.C. § 553 (2012) ........................................................17, 18

28 U.S.C. § 1291 ........................................................................2

28 U.S.C. § 1331 ........................................................................2

28 U.S.C. § 1367 ........................................................................2

29 U.S.C. §§ 141 *et seq.*........................................................34

29 U.S.C. §§ 201 *et seq.*.................. 1, 2, 3, 10, 13, 14, 15, 16, 19, 20, 22, 44, 51, 55

29 U.S.C. § 213 ........................................................................19, 55

29 U.S.C. § 216 ........................................................................2

A.R.S. §§ 23-350 *et seq.* (2012).....................................................2, 3

A.R.S. § 23-362 (2012)........................................................14, 19

A.R.S. §§ 28-101 *et seq.* ........................................................5, 28

vi

**Other Authorities**

29 C.F.R. § 791.2 (2015) ........................................................53

Ninth Circuit Rule 39-1.6 ......................................................57

Fed. R. Civ. P. 19 ..................................................................54

Fed. R. Civ. P. 56 ..................................................................13

Fed. R. App. P. 39 .................................................................57

Phoenix City Code, Chapter 4, Article IV ..........................5, 7, 28, 29, 30

PHX 331556042v15

**INTRODUCTION**

This case is about the independent status of taxicab drivers, who lease taxicabs for pick-up of passengers at Phoenix Sky Harbor International Airport (the "Airport"), and who are subject to extensive regulations originating from federal, state and local authorities. Chief Judge Silver of the District Court of Arizona (the "District Court") correctly ruled that these drivers were independent operators, using the "Economic Realities" test, *the* seminal standard utilized under the FLSA, to determine employment status in the Ninth Circuit and nationwide. As they did before the District Court below, Plaintiffs-Appellants ("Plaintiffs" or "Airport Drivers") endeavor in their Opening Brief to obfuscate the reality of their independence as taxicab drivers by focusing the inquiry, not on a holistic view of their daily realities and the regulations applicable to them, as the Economic Realities test demands, but on trivial elements of their daily operations that they contend hinder their otherwise overarching freedom. By focusing on the color and the grain of the tree bark, Plaintiffs nearly succeeded in making the trial court lose perspective and miss the forest altogether. Plaintiffs deploy the same strategy in this appeal, but it should not be countenanced. A holistic review of the realities of what Airport Drivers do demonstrates that they are completely free from any meaningful control by Defendants-Appellees ("Defendants" or "AAA Cab"), are instead regulated by governmental authorities (as opposed to AAA Cab itself).

Defendants are not, and never have been, Plaintiffs' employer. As further explained herein, no amount of focus on trivial details or misdirection can negate that the Plaintiff Airport Drivers are independent contractors.

## STATEMENT OF JURISDICTION

On February 6, 2012, Plaintiffs commenced this action in the District Court of Arizona, as a putative class and collective action, alleging that Defendants violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and the Arizona Wage Statutes, A.R.S. §§ 23-350 *et seq. See Ivan Pentchev Iontchev et al. v. AAA Cab Inc., et al.*, Case No. 2:12-CV-0256-PHX-ROS. Under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, the District Court had jurisdiction over this action. The District Court exercised supplemental jurisdiction over the state law claim, pursuant to 28 U.S.C. § 1367.

On March 18, 2015, the District Court granted Defendants' Motion for Summary Judgment, a fully dispositive motion, to dispose of the case (ER007-018), and final judgments were entered on March 31, 2015. ER001-002 (Case No. CV12-0256-PHX-ROS), ER003-004 (Case No. 14-CV-00038-ROS); and ER005-006 (Case No. 13-CV-02152-ROS).[1] This Court has jurisdiction to review the District Court's final judgment under 28 U.S.C. § 1291.

---

[1] The District Court action consisted of three cases that were consolidated on April 30, 2014. SER433.

PHX 331556042v15

## ISSUES PRESENTED

Whether the District Court properly granted Defendants' Motion for Summary Judgment, thus, disposing of the lawsuit, where Plaintiffs were deemed to be independent contractors and not employees, and, therefore, not required to be paid minimum wage.

## STATEMENT OF THE CASE

This appeal arises from a case in the District Court filed by a group of airport taxicab drivers who claim they were not paid minimum wage under the FLSA and the Arizona Wage Statutes, A.R.S. §§ 23-350 to 23-364. Plaintiffs and Defendants both filed motions for summary judgment on the core issue of whether Plaintiffs were independent contractors or employees of Defendants. Ultimately, if Plaintiffs were deemed independent contractors, Defendants would have no obligation to guarantee payment of minimum wage to them, but if they were employees, they would be entitled to receive minimum wage. After extensive briefing and oral argument, the District Court found in favor of Defendants in holding that Plaintiffs were independent contractors, not employees, as a matter of law. This appeal ensues.

PHX 331556042v15

## STATEMENT OF FACTS

## I. THE PARTIES' CONNECTION BY THEIR COMMON DESIRE TO OPERATE AT THE AIRPORT.

Defendant AAA Cab maintains a fleet of 140-180 taxicabs to be operated for transportation of passengers from the Airport, pursuant to a contract with the City of Phoenix ("City").[2] SER353:16-26; ER296-297.

Plaintiffs are/were independent taxicab operators, gaining access to vehicles from AAA Cab's fleet through a direct lease (or lease-purchase) agreement with AAA Cab or by subleasing the vehicle from another individual with a direct lease. SER216 at ¶3; ER441:2-14; SER264-269; SER295 at ¶4; SER242 at ¶7. Airport drivers incur lease or lease purchase fees plus operating expenses (fees, gas, etc.), which they may share with one or more secondary drivers. SER245 at ¶19.

Airport Drivers that have an agreement with AAA Cab are often called "primary drivers" or "leaseholders," and drivers that are retained by primary drivers, via sublease, to help operate the leased or purchased taxicab are referred to as "relief drivers." Unlike primary drivers, relief drivers have no contract with Defendants. SER216 at ¶3; SER405:15-16; SER380 at ¶ 43-44. Almost all drivers elect to retain a relief driver at one point or another (or be one themselves), and there is no restriction on that practice. SER406:9-11; SER389 at ¶92; SER342 at ¶7.

---

[2] Defendant AAA Cab is the central defendant in the action. The other defendants named in the case are either tangential companies or individuals who own/operate AAA Cab.

## II.    THE TAXICAB INDUSTRY IS SUBJECT TO EXTENSIVE GOVERNMENT REGULATIONS THAT BIND AIRPORT DRIVERS AND DEFINE THE ENVIRONMENT IN WHICH THEY APPLY THEIR TRADE BUT THESE REGULATIONS ARE NOT PROMULGATED BY DEFENDANTS.

The taxicab industry, particularly at the Airport, is heavily regulated as follows:

- The federal government requires that taxicab drivers at the Airport have clean records, pass a security assessment background check and refrain from using profanities on open air-waves. ER248:6-19.

- The state of Arizona requires that drivers be bonded and maintain insurance meeting specific requirements, and imposes a structure of meter rates for taxicabs. *See*, *e.g.*, A.R.S. § 28-101 *et seq.*

- The City [Phoenix City Code, Chapter 4, Article IV, included as Appendix A to as "The Phoenix Aviation Ground Transportation Manual (ER158-ER167)] imposes a comprehensive set of regulations on all individuals and entities that operate commercial vehicles at the Airport, addressing anything from the hygiene, appearance and passenger services of drivers, to the obligation to take the shortest route to the drop off point, as well as insurance requirements and inspections.  ER070; ER133-134; ER135-136;  ER160;  ER295-362;  ER517:5-22;  SER119  at  ¶  8; SER286:24-SER288:13.

In addition to its regulations, the City imposes, maintains and enforces a disciplinary system based on attribution of points for violations of the City Code at the Airport, which only its personnel can issue and administer. ER168-169; ER241:18-ER251:19. The City created its own exclusive forms for this disciplinary process (*see, e.g.*, Notice of Violation at ER363). ER168-169; ER238:21-ER241:6; SER105 (imposing removal of drivers from Airport operations).

The City also imposes requirements via its procurement contract with ground transportation companies, including AAA Cab and the two other taxicab fleet operators at the Airport. ER295-362. These requirements include, *inter alia*:

- Payment of fees for every cab authorized to operate at the Airport, ER296-297;

- Mandatory and unannounced inspections, SER303 at ¶23;

- Use of E-85 fuel in all vehicles, SER348 at ¶2; SER351 at ¶25;

- Acceptance of credit card payment, SER345 at ¶25-26;

- Compliance with City's Airport dispatching process, ER115; SER217 at ¶ 6; ER014:2-ER015:18; SER259:7-14 (allowing City agents, or OSCARs, to provide comment cards to passengers);

- Each taxicab must be equipped with a credit card processing machine that the passenger can operate from the backseat, a two-way radio, and an

area to display the driver's Airport Driver ID on the dashboard, ER119; ER126; ER133; ER159; ER295-362; SER219 at ¶12; and

- Price of fares must be clearly displayed. ER123; ER124; ER130; ER135; ER136; ER140; ER145; SER216 at ¶ 12.

Defendants do not have a manual or handbook that applies to Airport Drivers, and only require primary drivers to pay their fixed weekly lease/purchase fees to retain their cabs. SER218 at ¶7; SER242 at ¶ 4-6; SER260:8-17; SER261:4-8; SER262:8-18; SER323:5-SER324:4; ER390:21-ER391:14; SER340:2-9; SER343 at ¶2; ER525:10-24; ER573:7-23. Defendants infrequently prepare and make available (mainly to primary drivers) reminders of the need to comply with various applicable rules and regulations promulgated by governmental authorities. ER650; ER653; ER655; ER656; ER579:9-ER580:14; ER590:6-17; SER218 at ¶ 8-9 (they are not policies of Defendants).

Each Airport taxicab displays the AAA Cab trademark and number, and an advertisement atop the roof, generally one advertising a flat $15 (plus additional miles) return fare to the Airport, which is designed to stimulate greater utilization of the fleet and more revenues for drivers. SER216 at ¶3-SER219 at ¶12; SER221-224; ER397:15-ER398:7.

7

### III. AIRPORT DRIVERS (PLAINTIFFS) OPERATE WITH COMPLETE INDEPENDENCE WITHOUT ANY AAA CAB OVERSIGHT.

Airport Drivers who operate AAA Cab vehicles have complete operational autonomy. SER242 at ¶4-7; SER310-SER312; ER605:18-21; ER607:24-ER608:6; ER613:8-14; SER216 at ¶4-5; SER332:13-SER334:4; SER301 at ¶17; SER219 at ¶11; SER264 at ¶4. This autonomy manifests itself in many ways, including:

- Freedom to operate taxicabs as little or as much as desired, and to allow relief drivers to operate the taxicabs, in whole or in part, SER283:19-SER294:17; ER441:2-25; SER393 at ¶4; SER300 at ¶11-SER301 at ¶12; SER216 at ¶5; SER306 at ¶6; SER242 at ¶7; SER266 at ¶5;

- Freedom to schedule any desired time off without consultation or reporting, SER277:1-SER282:5 (Bulgaria trip), SER347 at ¶14; SER350 at ¶ 16; SER344 at ¶16; SER296 at ¶ 15;  SER301 at ¶15 (payment of portion of lease);

- Unfettered option to seek return fares from AAA Cab or accept return fares if hailed by passengers seeking a ride to the Airport, SER219 at ¶13; SER326:4-23; ER609:21-ER610:10; SER307 at ¶10; SER292 at ¶ 20; SER297 at ¶17; SER301 at ¶17; SER347 at ¶16; SER350at ¶18; SER344 at ¶18; SER121-SER214  (half of opt-in claimants taking return fares).

- Ability to develop and maintain repeat customers, SER325:11-23; SER326:20-SER327:4; ER609:21-ER610:2; ER128:5-7; ER449:11-20; SER292 at ¶20; SER297 at ¶17; SER301 at ¶16; SER350 at ¶18; SER344 at ¶18-19; SER219 at ¶11; SER307 at ¶ 9; SER242 at ¶7; SER265 at ¶6;

- Right to create and hand out own business card and/or personal cell phone number, SER219 at ¶13; SER326:4-23; ER609:21-SER610:10; SER306 at ¶10; SER292 at ¶20; SER297 at ¶17; SER301 at ¶17; SER347 at ¶ 16; SER350 at ¶18; SER344 at ¶18; SER326:14-19; SER292; SER297 at ¶18; SER302 at ¶18-19; SER350 at ¶19; SER344 at ¶18; SER219 at ¶13; SER307 at ¶10; SER264 at ¶3; and ER179-184;

- Right to maintain an alternate credit card processing system. ER459:7-12; SER285:4-9; SER302 at ¶19; SER243 at ¶10;

- No obligation to wear a uniform or AAA Cab logo. SER275:19-SER276:23; ER540:11-ER541:11; SER292 at ¶ 19; SER296 at ¶16; SER347 at ¶15; SER350 at ¶17; SER344 at ¶17;

- Ability to use taxicab to pursue business away from the Airport. SER307 at ¶9; SER302 at ¶19;

- No requirement to report time, location, activity or earnings of any kind. SER216 at ¶4-SER217 at ¶7.

- Absence of any evaluation or performance assessment of Airport Drivers by Defendants. SER216 at ¶4-SER217 at ¶7.

- Freedom to use AAA Cab's dispatch system as much or as little as desired. SER219 at ¶11.

The independence of Airport Drivers manifests itself through other common experiences. Many Airport Drivers have prior taxicab experience before leasing from AAA Cab. SER274:10-14; SER288:14-20; SER317:12-SER318:25; SER319:25-SER320:3; SER321:21-SER322:27. AAA Cab has never paid Airport Drivers any wages; instead they are paid directly by passengers. SER216 at ¶5. Airport Drivers have the ability to maintain daily logs of fares, if they so choose. SER319:5-24. Drivers can and do accept long-distance fares. SER329:14-SER331:23 ($650 California-trip). Payment of fares in cash to Plaintiffs does not pass through AAA Cab, and AAA Cab does not document Plaintiffs' hours. SER245 at ¶20; ER012. Using third-party records, Defendants determined that the average Airport Driver earns more on an hourly basis than the minimum hourly wage rate applicable to employees. SER243 at ¶10-SER245 at ¶20.

## SUMMARY OF THE ARGUMENT

The District Court properly applied the well-established Economic Realities test (utilized by the Ninth Circuit and nationwide for decades) in determining that Airport Drivers are independent contractors under the FLSA. The Economic

Realities test is the correct standard for courts to utilize in assessing whether a worker should be classified as an employee or independent contractor. Plaintiffs are misguided in their efforts to re-write the elements of the Economic Realities test in reliance with a non-binding agency interpretation. Plaintiffs bring this appeal because they disagree with the District Court's conclusions that, (a) a "strong inference" existed that Airport Drivers were independent contractors, and (b) under a holistic review of the six factors of the Economic Realities test, Airport Drivers are properly classified as independent contractors.

Plaintiffs argue that the District Court erred in relying on *NLRB v. Friendly Cab Co.*, 512 F.3d 1090 (9th Cir. 2008), to find that there was a "strong inference" that the Airport Drivers are independent contractors. Yet, going back for almost a half-century, a strong inference can be found that taxicab drivers are independent contractors because they: (a) lease their cabs for a flat rate; (b) retain all of the proceeds from the fares they generate from the operation of the leased vehicle and (c) do not account for their earnings to the vehicle lessor. This strong inference of independence, recognized in *SIDA of Hawaii, Inc. v. NLRB*, 512 F.2d 354, 358-60 (9th Cir. 1975), and reiterated in *Friendly Cab*, is eminently applicable here where AAA Cab does not so much as maintain a manual applicable to Airport Drivers. The lower court was correct in adopting this inference in its analysis of the

relationship between the parties, and in evaluating the interplay between them and third parties, including the City.

Based on the undisputed facts, the District Court recognized that the City (and other governmental entities), not Defendants, imposed regulations over the manners in which Airport Drivers operate. Therefore, the District Court held that, to the extent the Airport Drivers believed they were subjected to rules that constrained their operations, these rules were not imposed upon them by AAA Cab. This absence of control under the first prong of the Economic Realities test substantially favors the independent contractor status of Airport Drivers.

With respect to the other factors of the Economic Realities test, the evidence and case law revealed that these Airport Drivers do not fit the indicia of employee status under the Economic Realities test. Further, Plaintiffs' contention of a joint employment relationship between the City and Defendants is wrong and not appropriately presented for appellate consideration. Finally, Plaintiffs failed to substantiate with proper evidence their claim that their hourly earnings fell below applicable minimum wage.

## ARGUMENT

### I.   STANDARD OF REVIEW

The Ninth Circuit reviews *de novo* a District Court's grant of a motion for summary judgment. *See, e.g.*, *Musick v. Burke*, 913 F.2d 1390, 1393-94 (9th Cir.

1990) (affirming summary judgment in favor of the defendant-appellee). Under Rule 56(c), Fed. R. Civ. P., summary judgment is proper where, as here, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [moving] party is entitled to a judgment as a matter of law." *See id.* In other words, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Thus, on an appellant's minimum-wage claims under the FLSA and Arizona law, summary judgment should be affirmed in favor of the appellee where, as here, the appellant failed to establish – by a preponderance of the evidence below – his or her status as an employee of the appellee, and the record shows that it is highly probable that the appellant is, in fact, an independent contractor of the appellee. *See, e.g., Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998) (acknowledging that "[i]n a suit brought under the FLSA, the [plaintiff] has the burden of proving that the [plaintiff] was not properly compensated for work performed") (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87

(1946)).[3]   For the reasons set forth below, summary judgment in favor of Defendants should be affirmed.

## II.   THE DISTRICT COURT CORRECTLY UTILIZED THE WELL-ESTABLISHED ECONOMIC REALITIES TEST IN RULING THAT PLAINTIFFS ARE INDEPENDENT CONTRACTORS.

Plaintiffs' case is based on their assertion that they, as Airport Drivers should be classified as employees, not independent contractors, pursuant to the FLSA.  In confirming that Airport Drivers are correctly classified as independent contractors, as a matter of law, the District Court dismissed Plaintiffs' case. ER018:9-11, 14-15.

To arrive at its holding, the District Court relied upon the well-established test courts use for analyzing whether a plaintiff is an  employee versus independent contractor – the "Economic Realities" test.  *See* ER014:1-18.  Although Plaintiffs have utilized the Economic Realities test as the lynch pin of their legal arguments throughout this case, they now turn to an administrative interpretation by the Department of Labor ("DOL") in an effort to up-end the Economic Realities test at the eleventh hour.  The Economic Realities test must remain the standard under the

---

[3]   A.R.S. § 23-362(D) ("[W]hether a person is an independent contractor or employee shall be determined according to the standards of the [FLSA], but the burden of proof shall be upon the party for whom the work is performed to show independent contractor status by clear and convincing evidence.").

FLSA, and Plaintiffs' desire to alter that, without persuasive legal support, should be rejected. [4]

### A. The Economic Realities Test is the Seminal Standard For Determining a Worker's Independent Contractor Status in Wage and Hour Matters.

In determining that Airport Drivers were independent contractors, the District Court properly applied the Economic Realities test, in accordance with the Ninth Circuit's historical adoption of this test. This test typically includes six factors to consider when determining the "economic reality" of the working relationship between worker and the company; these factors are non-exhaustive and are viewed holistically in light of the circumstances. ER014:1-18. These six factors are:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

---

[4] Plaintiffs were never able to prove that they did not receive minimum wage. The evidence actually adduced in the record, as opposed to Plaintiffs' own self-serving estimates, showed the contrary, that the Airport Drivers earned more than minimum wage, as further explained in Section V.

(5) the degree of permanence and duration of the working relationship; and

(6) the extent to which the service rendered is an integral part of the alleged

employer's business.

*Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754-55 (9th Cir. 1979) (citations omitted).   This test has been adopted and applied by federal courts nationwide, including the Ninth Circuit, for the better part of four decades.  *See, e.g., Real,* 603 F.2d at 754-55.

The District Court properly held that "[t]he FLSA requires the Court focus on the ***actual working conditions*** when deciding how the drivers should be classified.  Under those conditions, AAA Cab is correct" to classify the Airport Drivers as independent contractors.  ER014:4-6 (emphasis added).  In other words, an objective examination of the actual working conditions for Airport Drivers determines that they are independent contractors.

### B.    Plaintiffs Improperly Try To Modify the Economic Realities Test in Reliance Upon a Non-Binding Department of Labor Interpretation.

Plaintiffs concede that the Economic Realities test is the proper standard for the Court to utilize.  Opening Brief at 28-32.  Yet, they attempt to find "legal" support for various new arguments in the Opening Brief that would essentially re-write that test. Specifically, Plaintiffs rely extensively upon the Department of Labor Administrator's Interpretation No. 2015-1, dated July 15, 2015 ("AI 2015-

16

1"), which is little more than a DOL administrator's effort to reframe the Economic Realities test in a manner different than the one adopted by the Ninth Circuit.

AI 2015-1 is an interpretive rule that should receive no deference. AI 2015-1 seeks to challenge the existing application of the Economic Realities test and replace it with the generalization that "most workers are employees under the FLSA's broad definitions." *Id*. at 15. AI 2015-1 offers no meaningful guidance on the question of the independent contractor analysis, and, contrary to federal case law, is an attempt to make binding an entirely new standard without the procedural safeguards that Congress requires when engaging in agency rulemaking of this magnitude. The Supreme Court provided the agency specific warnings on this practice. *See, e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007); *Christopher v. SmithKline Beecham Corp.,* 132 S. Ct. 2156 (2012); and *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1201 (2015).

The Administrative Procedure Act establishes the procedural requirements an administrative agency must follow when issuing rules pursuant to its statutory mandate from Congress. 5 U.S.C. § 553. These requirements include publishing a notice of the proposed rule in the Federal Register, allowing a lengthy public comment period, responding to public arguments, and publishing a final version of the rule along with a statement of purpose. 5 U.S.C. § 553(b)-(c). The notice-and-

17

comment procedure "assure[s] fairness and mature consideration of rules of general application." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979) (internal quotations omitted). Rules promulgated through notice-and-comment rulemaking are referred to as legislative rules that "courts accept . . . as legally binding." *Long Island Care*, 551 U.S. at 165; *see also Mortgage Bankers*, 135 S. Ct. at 1201 (holding that only rules promulgated by an agency through notice-and-comment rulemaking are treated as legislative rules with "the force and effect of law") (internal quotations omitted).

Courts treat interpretive rules, or an agency's advisory statements, differently than legislative rules, and afford them far less deference. *See Mortgage Bankers*, 135 S. Ct. at 1201. The APA excludes interpretive rules from the notice-and-comment requirements. 5 U.S.C. § 553(b)(A). The lack of procedural safeguards in issuing interpretive rules makes it "comparatively easier for agencies than issuing legislative rules." *Mortgage Bankers*, 135 S. Ct. at 1203-04. This "convenience comes at a price: **[i]nterpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process**." *Id*. at 1204 (internal quotations omitted) (emphasis added). *See Skidmore v. Swift*, 323 U.S. 134, 139 (1944) (explaining that interpretive rules do not bind a court).

The Supreme Court has cautioned against giving legislative rules any persuasive authority because "[b]y deferring to interpretive rules, we [] allow[]

agencies to make binding rules unhampered by the notice-and-comment procedures." *Mortgage Bankers*, 135 S. Ct. at 1212 (Alito, J., concurring). While an agency may be free to issue interpretive rules, the Court should "decide—with no deference to the agency—whether that interpretation is correct. *Id*. at 1213 (Scalia, J., concurring). This is particularly true where the DOL's interpretation amounts to unfair surprise and a lack of considered judgment and fair warning. *Christopher*, 132 S. Ct. at 2165-70 (refusing to give any persuasive weight to DOL amicus brief interpreting the exemption to the overtime requirement in 29 U.S.C. § 213(a) where DOL's analysis was a shift in reasoning without the notice-and-comment procedures).[5]

In this case, AI 2015-1 is a mere interpretive rule. *See Mortgage Bankers*, 135 S. Ct. at 1210 (defining a DOL Administrator's Interpretation, a new form of agency pronouncement, as an interpretive rule). AI 2015-1's limited scope is

---

[5] In *Christopher*, the Supreme Court held that the petitioners were "outside salesmen" exempted from FLSA coverage. 132 S. Ct. at 2170-74. In light of the DOL's inconsistent interpretation, the Court placed some of the burden on petitioners to show that they were not exempt from the FLSA, rather than requiring their employer to carry the full burden of proof in establishing that the petitioners were exempt as outside salesmen. *Id*. In this regard, the DOL's changing interpretation as to the analysis of independent contractor in light of decades of reliance on the Economic Realities test and the inference of independence in the taxicab industry would likewise place the onus on Appellants to show that they were covered employees under the FLSA. *Id*. To the extent it is inconsistent with the ruling of the Supreme Court in *Christopher*, the pronouncement as to the parties' burden of proof under the Arizona Minimum Wage Act, A.R.S. § 23-362(D), would thereby be preempted. *Id*.

insufficient to cause a court to reject the most widely used and recognized test on the issue of independent contractor status, and decades of related jurisprudence, merely to generate a test geared towards an agency's unilaterally preferred outcome. Because AI 2015-1 is little more than an invocation for a new standard, it should be rejected in the same manner the Supreme Court unanimously dismissed the DOL's amicus brief in *Christopher.* 132 S. Ct. at 2167-68 (observing that, where a new DOL interpretation is inconsistent with its long-established reasoning, the "plausible hypothesis is that the Department did not think the industry's practice was unlawful"). This Court is not bound by AI 2015-1, and should give it no weight in reviewing the determination that Airport Drivers are, indeed, independent contractors.

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS DETERMINING THAT PLAINTIFFS ARE INDEPENDENT CONTRACTORS UNDER THE FLSA.

Utilizing the Economic Realities test, the District Court examined whether the Airport Drivers were properly classified as independent contractors and confirmed that classification. Airport Drivers were independent operators, gaining access to vehicles in AAA Cab's fleet through a purchase or direct lease agreement with AAA Cab, or by sub-leasing from another individual with a primary lease or lease purchase.

20

The issue of the status of taxicab drivers as independent contractors is not one of first impression. Indeed, there are numerous industry-specific decisions, spanning approximately a half-century, where a strong inference has developed that taxicab drivers who lease a vehicle for a flat rate and retain 100% of the proceeds from fares they generate from operating their vehicle without accounting for those fares with the fleet company are, indeed, independent contractors and not employees. In *Local 777, Democratic Union Org. Comm.,* 603 F.2d 862 (D.C. Cir. 1975), a panel from the D.C. Circuit Court of Appeals held that:

> When a driver pays a fixed rental, regardless of his earnings on a particular day, and when he retains all the fares he collects without having to account to the company in any way, there is a strong inference that the cab company involved does not exert control over "the means and manner" of his performance. This conclusion is justified because under such circumstances, the company simply would have no financial incentive to exert control over its drivers, other than such as is necessary to immunize the proprietor of a cab from liability which arises from its operation by virtue of the lessor's ownership. However the driver conducts his occupation, the company has received its financial reward and the cab driver's self interest in the success of his venture and the municipal regulations are some assurance that the cab service will continue to be attractive to customers.

603 F.2d at 868. Numerous other decisions recognize and endorse this logical approach specific to the taxicab industry. *SIDA of Hawaii, Inc. v. NLRB,* 512 F.2d 354, at 358-60 (holding cab drivers who affiliated with SIDA were independent

21

operators and efforts by association to ensure compliance with applicable regulations and mutually beneficial business practices were not indicia of employment relationship) (cited with approval in *Friendly Cab*, 512 F.3d at 1097, n.7); *Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366, 374 (D.C. Cir. 1983) (adhering to presumption of independent operator and finding taxicab leaseholders/drivers not to be employees); *NLRB v. Associated Diamond Cabs*, 702 F.2d 912 (11th Cir. 1983) (same); *Air Transit, Inc. v. NLRB*, 679 F.2d 1095 (4th Cir. 1982) (same); s*ee also Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 13 (E.D.N.Y. 2014) (using same rationale in context of FLSA and finding driver who leased his vehicle in 8 or 12-hour increment was not an employee under the FLSA Economic Realities test); *Saleem v. Corp. Transp. Grp., Ltd.*, No. 12-CV-8450 (JMF), 2014 WL 4626075, at *9 (S.D.N.Y. Sept. 16, 2014) (identifying absence of control by transportation company and complete scheduling and operational performance freedom of drivers strongly supportive of independent contractor status under FLSA and NY state law). The logic for this presumption is as evident here as in any other industry case, if not more so. Once an Airport Driver leases a cab from AAA Cab, s/he is free to operate that vehicle as much, or as little, as desired and in any manner deemed fit. The way in which the vehicle is used is inconsequential because the obligation to pay the lease remains regardless of the amount of fares a driver elects to take per day.

22

This absence of oversight manifests itself in countless, evident ways in this case as further detailed in the analysis below. All of the usual components of the daily operations of a taxicab, including days off, start time, end time, rest or meal breaks, use of a relief driver (or multiple relief drivers), decision to accept flags, dispatches or return fares, maintenance of personal clientele, use of vehicle for personal errands, *inter alia*, become largely irrelevant to the fleet management company, all of which is true for AAA Cab. This means AAA Cab does not exercise "control" over Airport Drivers.

Combining this strong presumption with the analysis of each of the six factors of the Economic Realities test means that the nature of the Airport Drivers' relationships with AAA Cab was one of complete freedom of operations within the significantly regulated context of the Airport ground transportation industry, making them independent contractors. *See SIDA,* 512 F.2d at 359 (airport regulations and reminders of need for compliance therewith did not undermine airport taxicab drivers' freedom of operations and independent status); *Elite Limousine Plus*, *Inc.*, 324 N.L.R.B. 992, 1001 (1997) (company lack of control and flat lease arrangement supported independent operator status); *Checker Cab Co.*, 273 N.L.R.B. 1492 (1985) (same, finding, *inter alia*, that use of a meter in accordance with state requirements was not an indication of control).

With the foundation of the aforementioned legal authority guiding the employee versus independent contractor inquiry, the District Court issued its Order granting summary judgment in Defendants' favor in a holistic framework addressing each of the pertinent factors of the Economic Realities test. This holistic framework also guides the analysis below.

### A. Under the First and Most Significant Prong of the Economic Realities Test, the District Court Accurately Held That Defendants Do Not Exercise Control Over Plaintiffs' Work.

At the beginning of the analysis of the control prong, it is crucial to recall the list of all of the ways in which Defendants refrain from exercising control over the Airport Drivers:

- Defendants have no manual for Airport Drivers.

- Defendants offer the use of a dispatch system that many drivers use, but upon which most Airport Drivers do not to rely extensively.

- Airport Drivers never have to report their location or when they are active.

- Primary leaseholders are free to rely upon the services of relief drivers, under any terms and conditions they find acceptable, without involvement from Defendants (so long as a relief driver is in possession of an Airport Driver ID).

- Airport Drivers are free to give out their personal business cards or cell phone numbers, accept flags and return fares or maintain a list of personal clients.

- Drivers can take any time off they want, using a relief driver to operate the cab or returning it to Defendants.

- Drivers retain all of the monies earn from the operation of the cab (minus a $1 per passenger Airport loading fee that is charged on all trips and redeemed to the City, and the 6% cost of processing fares via the credit card terminal inside the cab) without accounting to Defendants.

- Defendants do not require that Airport Drivers wear a uniform, name tag, or any company logo.

- Defendants do not evaluate, not ride along with or follow Airport Drivers, to monitor compliance with regulations or performance standards.

- Defendants do not require Airport Drivers to abide by any schedule or attendance log.

- AAA Cab does not impose a minimum hours requirement for cab operations.

- Defendants do not require that Airport Drivers maintain logs of all trips completed or account for mileage.

- Defendants do not prevent Airport Drivers from using leased vehicles for personal errands or to be driven to and parked at their residence.

Plaintiffs obfuscate these substantial freedoms by arguing that Defendants exercise a more subtle form of control by coopting regulations applicable to Airport Drivers, even though they are generated by entities other than AAA Cab. Plaintiffs contend that Defendants implemented an additional set of rules and regulations requiring, *inter alia*, a dress code, use of shortest route to a destination, acceptance of payment via credit cards, proof of exclusive use of E-85 fuel, and availability for inspections, failing to admit that all these requirements are imposed by the City.

As should remain clear throughout, but appeared to have become confused over the course of the significant summary judgment briefing in District Court, all Airport Drivers are obligated to comply with all federal, state and municipal rules applicable to the Airport on all of the points erroneously enumerated by Plaintiffs as being imposed by Defendants. This is true regardless of the company from which an Airport Driver leases an Airport-worthy vehicle. As held in numerous decisions, regulations of operations that emanate from governmental entities, including contracts with said entities, are not indicia of company control and

26

cannot be used to support the argument that their existence supports the existence of an employment relationship. For instance, in *SIDA,* a Ninth Circuit panel analyzing whether cab drivers in Hawaii were employees found that:

> Several of the Association's regulations simply incorporate the requirements imposed on SIDA by its commercial contracts and certain state and local ordinances (e.g., presence of line operators at the airport, liability insurance requirements, and rules regarding the personal appearance of the drivers). […] **[T]hat a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship**. Furthermore, we do not find the incorporation of the requirements of the SIDA-State of Hawaii contract to be inconsistent with an independent contractor relationship, in that such an incorporation benefits both parties by insuring continued operation under the contract.

512 F.2d at 359 (internal citations omitted) (emphasis added). *See also Friendly Cab*, 512 F.3d at 1097, fn. 7; *Yellow Taxi*, 721 F.2d at 376-77 (finding that efforts to ensure compliance with governmental regulations do not evidence control supporting a finding of an employment relationship); *Diamond Cabs*, 702 F.2d at 921-22 ("[R]egulation imposed by governmental authorities does not evidence control by the employer.") (same); *Air Transit*, 679 F.2d at 1099 (same); *Rabanal v. Rideshare Port Mgmt., LLC,* B239708, 2013 WL 6020340, at *5-8 (Cal. App. Dep't Super. Ct. Nov. 13, 2013) (requirements imposed upon shuttle operator by City of Los Angeles in conjunction with operations at LAX through concession

contract did not support argument that operator exercised control over shuttle drivers).

It is undeniable that the taxicab industry is heavily regulated in Arizona, *see, e.g.,* A.R.S. § 28-101 *et seq.*, especially with respect to transporting passengers from the Airport. *See* Phoenix City Code, Ch. 4, Art. IV. These state and local regulations apply to all individuals who operate taxicabs and are not created by Defendants. Instead, every driver who applies for an Airport Driver ID independently and knowingly makes the choice to be bound and abide by these governmental regulations.

The City Code and the Airport Rules contain significant applicable municipal requirements by which all Airport Drivers must abide, including these:

- Drivers must use the most direct route. City Code Ch. 4, Art. IV at ¶¶4-77(f): ("Failure of a driver to take the most direct route to the passenger's destination unless otherwise directed by the passenger shall be unlawful.") This requirement is derived from state regulations and is repeated in the Airport Rules. Since taking any other route than the most direct one would be unlawful, Plaintiffs' assertion that Defendants imposed this requirement upon drivers to "control [this aspect] of driver behavior" is simply wrong, and the District Court was right in correcting its initial view that this rule had been imposed by AAA Cab. See ER023-024. Further, the scheduled

28

fare that all Airport Drivers must charge passengers is set by the City, not Defendants, and is expressed primarily as a function of miles traveled, thereby making using anything less than the most direct route an unlawful attempt to overcharge the passenger. City Code Ch. 4, Art. IV at ¶¶4-83.

- The Airport Rules require that drivers be "courteous" and "professional" and "avoid being loud," or engaging in "boisterous verbal disputes." Asking Airport Drivers to avoid using foul language over airways that can be heard by third parties is an extension of that Airport Rule, not something created by Defendants.

- The City Code requires that all drivers maintain insurance and designate the City and its agents as "additional insureds" under their insurance policy. City Code Ch. 4, Art. IV at ¶¶4-70(b)(3). Therefore, the Airport Drivers are required to comply with commercial insurance policies that require among other things reporting accidents immediately. These requirements are, thus, based on municipal rules, not on the Defendants' alleged control of Airport Drivers.[6]

---

[6] As a business practice, AAA Cab maintains an umbrella insurance policy for all of its Airport taxicabs and a portion of weekly payments from all drivers goes to pay for that policy, thereby providing coverage for all parties involved, including the City, in accordance with the City Code and the Airport Contract. SER 217 at ¶ 6.

- Plaintiffs have consistently maintained that Defendants control the way Airport Drivers dress, but the evidence is unequivocal that the City imposes this requirement. Paragraph 8 of the Individuals section of the Airport Rules (entitled "Driver Attire/Hygiene") provides very specific guidelines on what drivers can wear (solid collared shirts, closed-toe shoes with socks, etc.) and even how they should look (avoid body odor, keep facial hair neatly trimmed, etc.).

- Plaintiffs argued that AAA Cab imposed a disciplinary regime over Airport Drivers above, and beyond what the City already created. In reality, the City imposes, maintains and enforces an elaborate disciplinary system for use at the Airport obviating any need for an additional disciplinary scheme. Specifically, as Tracey Rivas, the City's 30(b)(6) representative, noted, the City implemented a point system for violations of Airport Rules. https://skyharbor.com/about/AirportRulesRegulations.html ("Schedule of Penalties"). Only City personnel may issue citations for violations of the Phoenix City Code and Airport Rules and Regulations to drivers and operators. The forms created and used by the City for disciplinary procedures are the only forms in place for discipline of Airport drivers. Defendants have no such form, and Plaintiffs submitted no evidence of any such form because no such evidence exists. The only action that Defendants

30

can take is to terminate their relationship with an Airport Driver.[7] Even if Defendants on infrequent occasions elect to terminate a relationship with an Airport Driver, who showed consistent unwillingness to comply with applicable rules, this does not show control over that Airport Driver, but quite literally the opposite, in that the inability to control the performance of a driver leaves Defendants with no choice but to end the relationship with the unruly driver.

Plaintiffs also contend that Defendants control Airport Drivers because they are ordered to respond to starters (individuals at the Airport who direct the flow of taxicabs at the C Lot and terminal cab stands, also called OSCARs), and participate in inquiries and inspections from the City. These are all contractual requirements that the City imposes, both in the contract with AAA Cab and when Airport Drivers agree to abide by Airport Rules. As explained in *SIDA*, "we do not find the incorporation of the requirements of the SIDA-State of Hawaii contract [in the relationship between airport drivers and SIDA] to be inconsistent with an independent contractor relationship, in that such an incorporation benefits both parties by insuring continued operation under the contract." 512 F. 2d at 358-59.

---

[7] There is evidence in the record that Defendants have been ordered on occasion by the City to remove a driver from Airport operations, referred to as redlining, but this situation is not an act of control on the part of Defendants over Plaintiffs but rather a decision of the City in the event of a violation of Airport Rules and/or implementation of the disciplinary process, which AAA Cab and all Airport Drivers are contractually obligated to respect. ER238:21-ER241:19.

Per the contract between the City and AAA Cab, the City conducts quarterly inspections of AAA Cab's entire Airport taxicab fleet. As a result, AAA Cab informs Airport Drivers, upon receiving notice from the City, when these inspections will occur, and Airport Drivers must make their cabs available for inspection by City personnel. City personnel also conducts unannounced inspections of Airport taxicabs on Airport premises, monitoring appearance of driver and vehicle, compliance with Airport Rules and verifying that vehicles are fueled with E-85 gasoline, some of which has resulted in the issuance of notices of violations to Airport Drivers for various infractions to City rules and regulations including failure to wear a collared shirt or to accept payment via a credit card. These contractual requirements, much like regulations, are imposed upon drivers by the municipal entity, both directly and indirectly, not by the fleet company. *See Rabanal*, 2013 WL 6020340, at *9 (rejecting claim by van drivers that "dispatch requirements, such as "curb coordinators," running loops, the color scheme and identification requirements for operators' vans and uniforms, and limitations on access to LAX" were indicia of control by the transportation company because "these are all requirements imposed on [transportation company] by the City through the concession agreement.").

The record is clear that Defendants maintained no set of rules applicable to Airport Drivers and, at most, issued memoranda, reminders and encouragements to

Airport Drivers regarding the need to comply with applicable governmental requirements. These reminders cannot be construed, as a matter of law, as independent policies of AAA Cab, and they are not indicative of control. As the Court noted in *SIDA*,

> We disagree […] that the rules and regulations are instruments of control for the benefit of SIDA as an entity; rather, they can more accurately be seen as being designed to enforce standards of conduct to which all of the drivers should adhere in order to promote the SIDA image for the mutual benefit of the Association and its drivers. Examples of such required conduct are that the drivers be neat and courteous, display the SIDA identification on their dome lights and uniforms, and follow the instructions of dispatchers and line operators.

512 F. 2d at 358-59; *see also Equal Emp't Opportunity Comm'n v. N. Knox Sch. Corp.,* 154 F.3d 744, 748 (7th Cir. 1998) (noting that governmental contract requirements do not conflict with independent contractor status and finding that bus drivers were independent contractors, not employees of school district). The handful of reminders that Plaintiffs submitted with their briefing all fit squarely into the type of communications described in the above-quoted language in *SIDA* – communications bereft of the element of control, but designed to foster adherence to applicable standards mutually beneficial to Airport Drivers and Defendants.

Therefore, the presumption of independence and the existence of significant governmental regulations combine to unequivocally tip the scale of the control

33

prong of the Economic Realities test towards independent status, as the District Court correctly held in its final analysis.

### B. The District Court's Finding That Airport Drivers Are Free To Develop Business Was Correct.

If the evidence shows that workers are free to develop their own business, the second prong of the Economic Realities test weighs in favor of independent contractor status. *See Real*, 603 F.2d at 754-755; *Friendly Cab*, 512 F.3d at 1098.[8] As the District Court correctly held, the Airport Drivers are free to develop their own business and actually do so. Plaintiffs claim that the District Court was tricked into believing that the Airport Drivers operate their own business and that their ability to develop their own business is "illusory." The overwhelming amount of undisputable evidence, however, demonstrates that the Airport Drivers' independent business is very real.

---

[8] Although the *Friendly Cab* case hinges on the application of a different test for determination of independent contractor status under the NLRA (*i.e.*, the common law test), in light of some of the similarities between the two tests on the issues of business opportunities and control by the company, and since both matters are grounded in the taxicab industry, it must be noted that Airport Drivers enjoy far more autonomy than their counterparts in *Friendly Cab* . For example, Friendly Cab drivers were not allowed to partner with relief drivers, solicit and accept fares from any other source besides Friendly Cab, could not answer or use a personal cell phone, and were obligated to accept all packages and \dispatched fares, among <u>many</u> of the differentiating elements between those two cases. SER310-312.

34

### 1. The Evidence Clearly Shows that the Airport Drivers Operate Their Own Business.

The Airport Drivers have the ability, and do, engage in independent business opportunities. The evidence shows that: (a) drivers testified that they solicit and accept (and are allowed to do so) passengers away from the Airport; (b) some drivers create business cards to generate more personal business; (c) AAA Cab allows and encourages Airport Drivers to seek and accept independent return fares; (d) Airport Drivers are free to retain the services of a relief driver (or more than one) as long as that driver has proper Airport credentials (which are issued by the City); and (e) Plaintiffs admit they cannot produce a written policy to the contrary.

Seven current and former Airport Drivers provided declarations describing their personal business practices. This testimony demonstrates the diversity of practice that exemplifies the freedom of operations that Airport Drivers possess and utilize. Class members Jalil Karbassi and Hrach Hakobyan had business cards made to hand out to passengers and regularly accepted return fares preferably from local hotels because it guarantees a better clientele. Both have repeat clients that call them directly for personal pick-ups. Ebrima Tamba, a former Airport Driver, went even further in soliciting personal business. Because Saturday is generally the slowest day of the week at the Airport, Tamba would leave the Airport early on *most* Saturdays and go to busy night spots around the Phoenix area to get fares and increase revenues derived from the operation of his taxicab. He devised a policy of

35

giving his own business card to every passenger he picked up at the Airport that resulted in a fare of at least $30. Another class member, Samir Yousif, had occasion to solicit fares around Arizona State University in Tempe on a Saturday. He found the practice unsatisfactory and elected instead to remain based at the Airport. As a further display of Yousif's business independence, he uses his own credit card processing machine in his taxicab, to complement the one provided by AAA Cab, so he avoids paying processing fees on some fares.

Conversely, class member Jack Sherburn, who operates at the Airport exclusively as a relief driver because he prefers that arrangement to being personally responsible for a lease, infrequently accepts "personals" because "they tend to be on a schedule" and is preference is to set his "own schedule and not be dependent upon coordinating a pick up." As a result he elected not to invest in having his own business cards made. In comparison, class member Kardakh Danial accepts fares from anyone who flags him, because he thinks it is simply better to take all comers. He believes he is independent and AAA Cab gives him the opportunity to decide what fare to accept for himself. Even Plaintiff Class Representative Boateng testified that he hands out his cell phone number to certain passengers for a return fare to the Airport, generally writing his number on the fare receipt stub. Boateng once accepted a fare to California for $650 in cash, which he

negotiated with the passenger and neither sought permission nor reported his arrangement or whereabouts to Defendants.

Over half of the opt-in claimants have accepted return fare requests from passengers. All of these examples demonstrate that drivers have the freedom to set up their own business model and to make daily decisions impacting their profitability. That Airport Drivers arrive at different conclusions as to their own business model for the operation of their vehicle demonstrates their independence and their ability to pursue their entrepreneurial instincts on their own terms.

Furthermore, AAA Cab advertises the availability of taxicabs for return fares to the Airport. If Defendants had a policy precluding independent business opportunity for Airport Drivers, as Plaintiffs keep suggesting despite the absence of any evidence thereof, there is no reason why it would advertise the availability and affordability of that service. In addition, **every one of the opt-in claimants** who responded substantively to Defendants' First Set of Requests for Admissions, admitted that AAA Cab maintained no written policy precluding them from accepting return fares. SER126-127; SER132-133; SER138-139; SER156-157; SER162-163; SER168-169; SER174-175; SER179-180; SER184-185; SER190-191; SER195-196; SER201-202; SER206; SER209; and SER213-214. Further, more than half of the opt-ins (and all of the declarants Defendants identified in their motion for summary judgment) accepted fares from other sources than

37

Airport passengers, negating Plaintiffs' arguments that the practical realities of Airport operations precluded this practice.   Moreover, 25 of 38 drivers that provided evidence on this issue admit having accepted personal fares. The sheer fact that over 65% of them admitted to it demonstrates the existence of their freedom to develop business independently, whether the driver partakes of the opportunity or not.

Finally, Airport Drivers' random times spent away from driving their taxicabs illustrate their independent business opportunities.   Specifically, Airport Drivers have taken vacation and/or time off with regularity and sometimes for extended periods of time.   Lead Plaintiff Iontchev wanted to travel to Bulgaria for the whole summer of 2010 and tendered his cab back to AAA Cab.   He returned in the Fall, and sought to be a relief driver. After a few months, he assumed the lease of a primary driver, in January 2011.   Class members Danial, Adem, Hakobyan, Sherburn and Karbassi, among many others, use a relief driver to operate their cab when vacationing. They do not seek permission or approval from Defendants and those who are primary leaseholders prefer to retain the lease in their name and have their relief driver(s) pay the weekly lease amount on their behalf.   Most telling, class member Yousif secures a relief driver when he goes on vacation, and, creates an incentive for the relief driver to stay driving his cab during his vacation by giving the relief driver a $400 discount on the weekly lease rate.   By

unilaterally subsidizing a lease reduction, Yousif buys the peace of mind that his cab and lease will be there when he returns from vacation. These arrangements, which all commonly lack involvement of/by Defendants, demonstrate the freedom of operations and independent business opportunity available to Airport Drivers.

In sum, once an Airport Driver enters into a lease or purchase agreement with Defendants, that Airport Driver is free to operate the vehicle as much or as little as desired, at the Airport or elsewhere, and personally or via relief drivers under whatever arrangement s/he prefers --without involvement from Defendants. SER226-227.

### 2. Airport Drivers Have Independent Business Opportunities and Plaintiffs' Argument that They Are Illusory is Wrong.

The Economic Realities test requires an inquiry into whether a worker is free to develop his/her own business. Plaintiffs argue that-- despite all of the aforementioned evidence proving that the Airport Drivers can, and do, operate independent businesses -- the Court should discount all such evidence because it is "illusory." Plaintiffs provide no factual or legal support for this contention.

Plaintiffs attempt to create the impression that Airport Drivers must be operating independent business *away from* the Airport in order to be properly classified as independent contractors. There is no such obligation. First, Plaintiffs are **Airport Drivers** who pay AAA Cab (and/or another Airport transportation fleet provider) and the City for the ability to operate a taxicab at the Airport.

39

Having made that financial investment, it would make little economic sense to build an extensive practice away from the Airport, as opposed to adding to it. Airport Drivers who wish to operate a cab away from the Airport certainly can lease or purchase a non-Airport cab from AAA Cab or any other fleet provider. Plaintiff Class Representative Boateng previously leased a non-airport taxicab from Defendants, but then elected to become a relief driver, then a primary leaseholder of an Airport taxicab. The evident point of leasing or purchasing an Airport cab is to be able to operate at the Airport primarily.[9] This primary purpose, however, does not negate the fact that any and all Airport Drivers are free to put their taxicab to other use whenever they see fit, regardless of how frequently or infrequently, as detailed above.

Plaintiffs' legal argument relating to the freedom-to-develop-business prong is also not viable. Plaintiffs ask this Court to reverse the District Court because the Airport Drivers' ability to develop their own business is allegedly "illusory," yet Plaintiffs rely on a single inapposite and inapplicable case out of the Eastern District of Missouri, *Wells v. FedEx Ground Package Sys., Inc.*, 979 F. Supp. 2d 1006, 1023-24 (E.D. Mo. 2013), *rev'd sub nom. Gray v. Fedex Ground Package Sys., Inc.*, 799 F.3d 995, 1003 (9th Cir. 2015), for this proposition. Not only are

---

[9] Operating at the Airport does not render drivers "restrained by timetables effectively controlled" by Defendants, as Plaintiffs vociferate, because Defendants do not control the flow of passengers and do not impose any response time upon drivers.

the facts of the *Wells* decision inopposite, but the Eighth Circuit remanded that decision earlier this year for further factual determination. In other words, *Wells* have been cited at all. Lastly, Airport Drivers, unlike the FedEx drivers in *Wells*, may come and go as they please without any time slots in which they must drive or report to the Airport, they are free to retain others to drive their taxicabs and do not depend on AAA Cab for their fares, all of which is diametrically different than the facts in *Wells*. Illusory means only that something is not real. Because the Airport Drivers were free to develop their own business, and evidence shows that many of them availed themselves of this opportunity, it is by definition real and certainly not illusory.

For these reasons, the Court must reject Plaintiffs' cursory argument that the Airport Drivers' business opportunities are illusory due to lack of legal or factual support for that contention.

### C. Airport Drivers Retain the Opportunity for Profit and Loss in Their Operations of Their Taxicabs.

Another factor of the Economic Realities test demonstrating that Plaintiffs are independent contractors is the fact that the Airport Drivers retained opportunities for profit and loss. The parties agree that the practical question to ask under this particular factor is whether each Airport driver is ultimately "in business for himself." (Opening Brief at 50; SER427:19-21; SER 403:13-14.)

In weighing this prong, the District Court held:

41

> Here, the drivers have freedom to develop their own business, including providing taxi services away from the airport. The drivers are also free to work as little or as much as they would like and they can hire relief drivers to operate the vehicle when they are not working. Accordingly, the drivers' opportunities for profit or loss depend a great deal on how they utilize their vehicles.

Order. ER016:16-20.

Plaintiffs try but cannot negate this determination. In attempting to show that Airport Drivers are not in business for themselves, Plaintiffs rely upon *Castillo v. Givens*, 704 F.2d 181, 191 (5th Cir. 1983) (overruled on other grounds) in arguing that the Airport Drivers should be classified as employees due to their purported lack of managerial skill affecting their profit or loss. *Castillo* is easily distinguishable to the instant matter and should not carry weight as to the analysis of this prong of the Economic Realities test. *Castillo* involves an "illiterate cotton chopper" whose only tool and "investment" was a hoe and his manual labor; it is for that reason the *Castillo* court found that Castillo was not in business for himself and, therefore, not an independent contractor. 704 F.2d at 191-93. While Castillo was not in business for himself due to his lack of opportunity for any real profit or loss, the Airport Drivers here have far more capabilities to make a variety of decisions to influence their profits and losses, as the District Court found.

Further, in the *Saleem* case, "black car" drivers were deemed to have the opportunity for profit and loss of their business because they controlled the number

of jobs they accepted, defining their overall earnings. 2014 WL 4626075 at *12-13. The same result was reached in *Arena* on this prong. 3 F. Supp. 3d at 11-12 (control of amount of fares accepted and, consequently, earnings were consistent with independent driver operator status).

Contrary to Plaintiffs' allegations, Airport Drivers are in business for themselves because each of them makes numerous decisions to drive profits (and avoid losses). This opportunity starts at the inception of the Airport Drivers' association with Defendants, with the basic decision to become an Airport Driver. Plaintiffs must commit to investing the cost of leasing or purchasing an Airport-worthy taxicab. Many, like Plaintiffs Iontchev and Boateng, make this decision only after having been regular taxicab operators. Further, this fundamental choice to earn a living through operating an Airport taxicab is subject to daily evaluation. If Airport Drivers find it insufficiently lucrative, they can abandon this endeavor, even temporarily, as lead Plaintiff Iontchev demonstrated, electing to vacation for several months in Bulgaria rather than operating an Airport cab during the summer months.

Airport Drivers make other decisions impacting profitability, such as when to drive, and whether to hire other drivers or solicit private customers. *Saleem*, 2014 WL 4626075 at *10, 12. The *Saleem* court found that this ability showed independent contractor status for drivers in the same circumstances as the Airport

43

Drivers here. *Id*. at *12; *see also Arena*, 3 F. Supp. 3d at 11-12. Plaintiffs freely operate their vehicle as little or as much as they desire, once they lease it, to drive the vehicle for long hours, or to sublease the vehicle to one or more relief drivers to operate for a portion of the time, which almost all elect to do at some point. Sharing a cab with one or more relief drivers also means sharing the cost of operating the cab and the revenues generated from it.[10] There is no more meaningful decision affecting profits and losses than deciding to share in them with another individual. Since the amount of the lease rate remained unchanged, Plaintiffs could control their ability for profits and losses by evaluating the best way to use their cabs. As the court in *Arena* noted,

> There is also no dispute that Plaintiff received all revenues generated by the fares that Plaintiff picked up. Thus, if Plaintiff had more fares in a given day, it follows that Plaintiff earned more money. Plaintiff paid a pre-established rate for the daily lease of the vehicle that was not connected in any way to the fares collected by the driver. Therefore, even considering Plaintiff's claim that his compensation was diminished because of the amount he paid for the daily lease, Plaintiff controlled on how much overall money he earned as a result of the number of calls he took and fares he earned.

3 F. Supp. 3d at 11-12 (in context of FLSA finding that driver who leased his vehicle in 8 or 12-hour increment was not an employee).[11]

---

[10] A relief driver has no contract with Defendants, only with the primary driver.

[11] Fares are set by local law, as was the case in *Arena*. 3 F. Supp. 3d at 6-7. The existence of this regulation does not diminish the opportunity for profit or loss as it is common for anyone who elects to become involved in Airport transportation.

44

In addition to this freedom of operation and control over earnings, Plaintiffs had opportunities to seek return fares from AAA Cab or accept return fares if hailed by passengers seeking a ride to the Airport. This represents further opportunity for earnings that some drivers elect to take, including Plaintiff Class Representative Boateng, as discussed above. If a given driver decided that it was in his best interest to return as quickly as possible to the Airport without taking return fares, this only serves to demonstrates that drivers' independent business decision making ability on how to manage (and maximize) revenues.

It is for these reasons, that the District Court properly found that "[t]his factor weighs in favor of an independent contractor relationship" between the Airport Drivers and AAA Cab. ER016:13-21.

### D. The District Court's View That Some Factors Favor an Employment Relationship Was Inaccurate.

The District Court stated that, while conducting the Economic Realities inquiry, it construed the facts in light most favorable to Plaintiffs (even though each side cross moved for summary judgment). ER018:1-3. In doing so, the District Court conveyed that some of the factors in the Economic Realities test tipped in favor of Airport Drivers having an employment relationship with AAA Cab (while ultimately ruling that the Airport Drivers are independent contractors). Defendants would be remiss if they did not point out that the District Court's conclusions for these factors of the Economic Realities test do not appear to reflect

45

the record accurately. Indeed, where the District Court found that these factors showed an employment relationship, the findings were perfunctory and relied upon misunderstood evidence.

### 1. The District Court Erred in Deeming the Airport Drivers' Investment Factor "Neutral."

One of the factors in the Economic Realities test relates to Airport Drivers' investment into materials required for the job. If a worker invested into equipment or materials, s/he is more likely an independent contractor. That is the case here, but the District Court deemed this factor "neutral."

Drivers who make "substantial investments in their businesses" by maintaining their vehicles, paying for gasoline and car washes, and developing relationships with private customers," for example, show independent contractor characteristics. *See Saleem*, 2014 WL 4626075 at *12.[12]

Not only do Airport Drivers make an investment in leasing a taxicab of, at least, $122/day plus operating expenses (fees, gas, etc.) (or a different amount if the driver purchases a taxicab), but they also make a significant decision whether

---

[12] Citing only to AI 2015-1 (which carries no weight here), Plaintiffs claim that the test for this factor should be comparing how much investment the Airport Drivers make in their business relative to the investment made by AAA Cab. (Opening Brief, at 62-63) However, that is not an accurate statement of this prong. It is much more accurate to compare Plaintiffs' investment with their returns. As the evidence shows, empirical data suggests that an average Airport taxicab will generate approximately $50,000 in net annual profit for an equal or greater investment of capital annually. SER245 at ¶ 20.

to partner with another driver to share all or some of the costs (and profits) of that lease and negotiate those terms with the other driver, without Defendants' involvement.  Airport Drivers make additional investments in their business, such as buying business cards, cleaning products and car washes for their vehicle, whether to purchase a GPS system for navigation, where to find the least expensive E-85 gasoline, and developing a network of frequent customers with whom they do business directly. Also, Airport Drivers may set up mechanisms for processing credit cards at rates lower than those set by Defendants (currently 6%) on the cab default system.

While the District Court recognized that Airport Drivers make significant investment into their taxicabs and business operations, including the ability to hire "helpers" (i.e. relief drivers), it surprisingly deemed this factor as "neutral" in its analysis.  The only purported fact referenced by the District Court that it believed showed that the drivers do not invest into their taxicabs and businesses is that they "do not purchase their own vehicle nor are they required to purchase any other equipment." ER016:25-26.  This is wrong. Although there is no requirement that Airport Drivers *purchase* the taxi cabs, it is inaccurate to state that some do not actually purchase the taxicabs, because they do.  Indeed, it is uncontroverted that Airport Drivers have the option to purchase their cab and that a portion of them (about 15%, as stated in the City contracts) own the vehicle.  Moreover, even

leasing an Airport taxicab is still an investment into the equipment needed to perform their job, because those taxicabs are vehicles specifically approved by the City to meet its operational prerequisites. Airport Drivers invest into their cabs and business operations, and, therefore, this factor favors independent contractor status.

> ### 2. The District Court Did Not Thoroughly Assess If Driving a Taxi Requires the Type of Skill Contemplated by the Economic Realities Test.

One of the factors of the Economic Realities test evaluates whether the service provided involves a special skill. The District Court decided that this factor weighs in favor of an employment relationship, but provided no substantive analysis in support of this conclusion. The entirety of the District Court's analysis was the single statement that "Driving a vehicle is not a special skill." ER017:6.

Plaintiffs' Opening Brief gloms onto the District Court's finding by asking the Ninth Circuit to agree that driving taxicabs is not a special skill, but provides no support for that contention. The Opening Brief cites cases for the proposition that unskilled, routine work demonstrates an employment relationship. Those cases do not involve taxicab drivers and are distinguishable. (Opening Brief, at 64-65) (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1310 (5th Cir. 1976) (plaintiffs are women who waited at laundry stations to process laundry); *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (plaintiffs are "backers, pickers,

48

and peelers" of seafood); *Boyd v. Nashville Limo Bus., LLC*, No. 3:11-cv-0841, 2012 WL 4754659, at *1 (M.D. Tenn. Oct. 4, 2012) (moving vehicles to and from Nashville dealerships and auctions without carrying passengers)).

Airport Drivers have specific skills that should be considered here. To become an Airport Driver, Plaintiffs must maintain a clean driving record, obtain federal security, pass a City-administered test, and complete a defensive driving course. Individuals who meet (and subsequently maintain) these requirements may operate at the Airport. Once certified, Airport Drivers must demonstrate good customer service, compliance with applicable rules, and manage time operation effectively to maximize revenues. These are skills of a cab driver and indicative of an independent operator status. *See Arena*, 3 F. Supp. 3d at 12 (relying upon *Leach v. Kaykov*, No. 07-CV-4060 (KAM)(VVP), 2011 WL 1240022, at *19 (E.D.N.Y. 2011) (plaintiff maintained his own and a taxicab driver's licenses, operated his motor vehicle, and navigated between points of pick-up and delivery, [which] was characteristic of an independent contractor)). At a minimum, this factor should be deemed neutral, although in the totality of circumstances, Defendants contend this factor weighs in favor of independent status.[13]

---

[13] Even if, *arguendo*, driving is not deemed to be a special skill, this factor should hold nominal weight in contrast with the other five factors.

### 3. The Airport Drivers Do Not Have a Permanent Relationship with Defendants.

Another factor in the economic realities inquiry is the degree of permanence for the worker. Apparently, this factor of the Economic Realities test was partly misunderstood by the District Court, thus, leading to its erroneous opinion that this factor weighed in favor of an employment relationship. Without any analysis, the District Court stated that Airport Drivers had an "often-lengthy relationship." In drawing this conclusion, the District Court mentions only two drivers --out of the hundreds in this case -- who drove cabs for approximately eight and four years, respectively.[14]

To the contrary, the evidence shows that Airport Drivers do not have permanent working relationships with AAA Cab. Airport Drivers sublease their vehicles to relief drivers, who have no contract with Defendants and can substitute for multiple primary drivers. Neither the primary nor the relief driver has any permanent, or remotely permanent tie to AAA Cab. For example, Airport Drivers can take time off as they please and decide to give up their vehicle or entrust it to another driver. Despite this evidence, the District Court understood Lead Plaintiff

---

[14] Plaintiffs reference one additional driver who drove with Defendants since 2012. Thus, between Plaintiffs and the District Court, they collectively provide three examples of drivers who leased cabs through AAA Cab for a few years to support the argument that the hundreds of Airport Drivers at issue had permanent relationships with AAA Cab. As shown above, there is ample evidence to illustrate the opposite.

Iontchev's relationship with Defendants as continuous when, in reality, it was not.[15]

In contrast, hundreds of individuals stream through the ranks, working with Defendants for a short time or as relief drivers for various primary leaseholders, before leaving, sometimes without any notice, resulting in high turnover. More than 400 Airport Drivers were sent notices through the FLSA collective action process. Comparatively, the City requires AAA Cab to have between 140 and 180 taxicabs available in their fleet (although only 85% are required to be in actual use at peak levels). These numbers show that a significant percentage of individuals passed through as Airport Drivers at any one time. The substantial turnover of Airport Drivers with AAA Cab shows the very opposite of a permanent relationship.

There is also no permanency in the relationship between the passengers who ride in the taxicabs and Airport Drivers. Conversely, no individual driver is economically dependent upon any one customer for his/her earnings.

Plaintiffs rely on a case stating only that a Section 8 Coordinator position "was for an indefinite duration and either party could terminate the relationship at

---

[15] Iontchev left for vacation in Bulgaria for months at a time on several occasions, including most recently 2010, and worked as a relief driver for multiple different primary drivers. Thus, although Iontchev maintained some level of connection with AAA Cab for several years, it was not predicated upon a single permanent role, as opposed to the role that best suited Iontchev at any given time.

any time. These facts favor an employee relationship." (Dkt. Entry 9-1, at 65, citing *Mathis v. Hous. Auth. of Umatilla Cty.*, 242 F. Supp. 2d 777, 785 (D. Or. 2002)).  This perfunctory analysis does not take into account the facts of an Airport Driver's relationship with AAA Cab.  Had the Section 8 Coordinator in *Mathis* left the country without a replacement for three months, or someone else had appeared in his stead for several weeks, one must wonder how different the outcome in *Mathis* would have been.  The very interchangeability and turnover among Airport Drivers makes the single position, single claimant analysis in *Mathis*, 242 F. Supp. 2d at 785, irrelevant to this case. *Cf. Arena*, 3 F. Supp. 3d at 13 (finding interchangeability of drivers an element of lack of permanence).

Overall, the Economic Realities test, if properly applied with a clear holistic view of the evidence, demonstrates that the scale tips even more heavily in favor of independent contractor status for the Airport Drivers than the District Court found. Regardless, the District Court properly held that the Airport Drivers are independent contractors.

## IV.   NO JOINT EMPLOYMENT ISSUE EXISTS HERE

In their Opening Brief, Plaintiffs present the legal issue of joint employment, as one of its "Issues Presented," by requesting that the Ninth Circuit examine: "Whether AAA Yellow Cab is, at a minimum, a joint employer with the City of Phoenix."  Opening Brief at 31.  Plaintiffs' inclusion of a joint employment issue

in their appeal is puzzling because the concept that AAA Cab and the City were joint employers has never been an issue in this case, much less sufficiently raised at the summary judgment stage to warrant appellate review.

Plaintiffs' Response to Defendants' Supplemental Brief in Support of Motion for Summary Judgment contains one footnote on this issue stating, "Even if the City exercises some control over the drivers, AAA Yellow Cab would nevertheless be liable as a joint employer." SER427:1-17. On page 14 of that Response (not page 18, as Plaintiffs cite, which is the signature page), Plaintiffs make the most cursive reference to joint employment -- a boilerplate rendition of the elements of joint employment under 29 C.F.R. § 791.2(b). Plaintiffs offer no argument or analysis beyond their recitation of the legal standard. This is also the case in the Opening Brief where Plaintiffs simply regurgitate the CFR language and proclaim that AAA Cab entered into a contractual arrangement with the City, and therefore should be its joint employer without any further argument or analysis. Opening Brief at 67-68.

Under well-established law, Plaintiffs are foreclosed from raising new issues on appeal. "As a general rule, a federal appellate court does not consider an issue not passed upon below." *Seymour v. Coughlin Co.*, 609 F.2d 346, 348-49 (9th Cir. 1979) (internal quotations omitted) (affirming grant of summary judgment in favor of appellees, and declining to consider new argument raised by appellants for the

53

first time on appeal). The Ninth Circuit will not consider an issue "if the party against whom [it] is raised may be prejudiced by it." *Id.* In other words, if the party against whom the issue is raised "might have tried his case differently either by developing new facts in response to, or advancing distinct legal arguments against the issue," the Court will disregard the issue. *Id.* The City and Defendants obviously would be prejudiced by appellate consideration of this issue because the City is not present in this case to defend itself, and Defendants had no meaningful opportunity to address this theory.[16] Therefore, this issue cannot be considered on appeal.

## V. PLAINTIFFS' OUTRIGHT FAILURE TO PROVE THEIR MINIMUM WAGE CLAIMS FURTHER REVEALS THE FUTILITY OF THEIR CASE

As explained above, when dealing with the numerous indicia of lack of control in the first prong of the Economic Realities test, Airport Drivers retain all of the fares they generate from their operation of their taxicabs. Consequently, Airport Drivers alone know exactly how much each of them generates in total

---

[16] If Plaintiffs truly considered the City and Defendants to be joint employers, they should have joined the City as a defendant, pursuant to Federal Rule of Civil Procedure 19. "Rule 19 is designed to protect the interests of absent persons, as well as those already before the court, from duplicative litigation, inconsistent judicial determinations, or other practical impairment of their legal interests." *Hammond v. Clayton*, 83 F.3d 191, 195 (7th Cir. 1996). Plaintiffs did not raise this issue below, even though Rule 19(c) places an affirmative duty on Plaintiffs to identify in their pleadings any potentially interested parties who have not been joined. Fed. R. Civ. P. 19(c).

revenue. Not only is this relevant under three prongs of the Economic Realities test, but control over earnings also means that Airport Drivers had the ability to provide exact calculations of their purported damages. Despite this, drivers offered estimates instead of evidence-based calculations of their damages.

Because of the determination that Airport Drivers are independent contractors, the trial court made no determination pertaining to purported violations of minimum wage, but referenced "estimates" advanced by Plaintiffs without contrasting them with the actual data available to the parties from third parties.[17] If this Court were to review this portion of the case, it should become apparent that, as a matter of law, Plaintiffs did not establish the existence of a failure to pay minimum wage, further supporting summary disposition in favor of Defendants.[18]

Plaintiffs' use of "generalized allegations" to contend that they earned less than minimum wage is legally insufficient to meet the pleading requirements to establish the existence of a minimum wage violation under the FLSA. *Landers v.*

---

[17] In its reference to this data, the District Court quotes the estimates of hourly earnings of two Plaintiffs and restates only a select few of the reasons why Defendants believe these estimates are unreliable without addressing the legal flaw in how Plaintiffs created these calculations.

[18] The FLSA exempts taxi cab drivers from its overtime coverage requirements where the employer is "engaged in the business of operating taxi cabs." 29 U.S.C. § 213(b)(17). Plaintiffs recognize that if they prevailed in their action, they would be deemed employees of a taxi cab operator and exempt from overtime eligibility.

*Quality Commc'ns, Inc.*, 771 F.3d 638, 641-47 (9th Cir. 2014), *as amended* (Jan. 26, 2015), *cert denied*, 135 S. Ct. 1845 (2015).   If a plaintiff cannot rely exclusively upon generalized allegations at the onset of the case, a plaintiff should no more be entitled to rely upon generalized allegations at the conclusion of discovery at the summary judgment stage.  Yet, that is exactly what Plaintiffs did here, continuously contending that the average value of a fare was around $20-$25. Data from the City and the credit card payment processing company showed averages closer to $40 per fare.  This data is predicated upon a review of over 400,000 transactions handled by Airport Drivers.  Mathematically, Plaintiffs would not be able to establish a minimum wage violation using this average.  Plaintiffs, by and through their class representatives, had the opportunity to demonstrate the actual value of all of their fares, by maintaining records, because only drivers have access to the amount of all fares.   Yet, despite having this ability,[19] Plaintiffs elected instead to rely upon an estimate of the value of an average fare for their calculations of damages. As indicated in *Arena*, that a driver had exclusive access to records of all earnings nullifies Plaintiffs' suggestion that, pursuant to *Mt. Clemmons Pottery*, their proffer of the measure of damages is inherently sufficient

---

[19]   Although some of the Plaintiffs were not active drivers, it is undisputed that class representatives Boateng and Deng were active drivers throughout this litigation.   Indeed class representative Boateng initially admitted during his deposition that he maintained a contemporaneous log of all fares, only for those logs to go missing when formally requested in writing.

56

to establish the existence of a failure to pay minimum wage. 3 F. Supp. 3d at 8, n. 7; *see also Imada*, 138 F.3d at 1296. In light of the rationale announced in *Landers*, the analysis in *Arena* is correct and the Airport Drivers who alone had access to the exact records of all of their fares cannot meet their burden of proof by simply substituting an estimate in lieu of an empirically-based number that they had the opportunity, and the affirmative duty, to place in the record. *See id.*; *Landers*, 771 F.3d at 641-47. Plaintiffs' failure to deliver proof in their possession is tantamount to spoliation of evidence, and the inference should be drawn that, as the data gathered from over 400,000 credit card transactions demonstrated, actual per fare earnings do not establish the existence of a violation of minimum wage, with the lowest hourly rate of earnings at $8.34, even assuming a 126-hour workweek (or seven days at 18 hours). In sum, minimum wage laws were applied. Plaintiffs failed to proffer the evidence to prove that they did not receive minimum wage.

## CONCLUSION

Based on the foregoing reasons, Defendants respectfully request that this Court affirm the District Court's Order granting summary judgment and its issuance of final judgment in favor of Defendants, and permit Defendants to submit a request for an award of attorneys' fees and costs against Plaintiffs, pursuant to FRAP 39 and 39-1.6.

Respectfully submitted this 28th day of October, 2015.

GREENBERG TRAURIG, LLP

By: */s/  Laurent R.G. Badoux*
　　Laurent R.G. Badoux (020753)
　　badouxl@gtlaw.com
　　Dana L. Hooper (023801)
　　hooperd@gtlaw.com
　　GREENBERG TRAURIG, LLP
　　2375 E. Camelback Road, Ste. 700
　　Phoenix, Arizona 85016
　　*Attorneys for Defendants/Appellees*

PHX 331556042v15

## STATEMENT OF RELATED CASES

Appellees are not aware of any related cases currently pending before this Court.

*PHX 331556042v15*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c) and Ninth Circuit Rule 32-1, I certify that the attached brief is proportionately spaced, has a typeface of 14 points, and contains 13,354 words.

*/s/ Laurent R.G. Badoux*
Laurent R.G. Badoux
Dana L. Hooper

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that service will be accomplished by the appellate CM/ECF system upon all participants in the case that are registered CM/ECF users. I certify that service upon all non CM/ECF users will be accomplished by U.S. Mail.

*/s/    Laurent R.G. Badoux*

PHX 331556042v15